Filed 6/4/20 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MATTHEW BOERMEESTER,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>AINSLEY CARRY et al.,<br><br>  Defendants and Respondents. | B290675<br><br>(Los Angeles County<br>Super. Ct. No. BS170473)<br><br>ORDER MODIFYING<br>OPINION<br><br>[No change in the judgment] |

IT IS ORDERED that the opinion filed in the above-captioned matter on May 28, 2020, be modified as follows:

1.  On the caption page, respondents' counsel's name is modified to read:
    "Julie Arias Young"

There is no change in the judgment.

_____

BIGELOW, P. J.          STRATTON, J.          WILEY, J.

Filed 5/28/20 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MATTHEW BOERMEESTER, | B290675 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS170473) |
| v. | |
| AINSLEY CARRY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Amy D. Hogue, Judge. Reversed and remanded with directions.

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

Young & Zinn, Julie Arias and Karen J. Pazzani for Defendants and Respondents.

_____

Matthew Boermeester was expelled from the University of Southern California (USC) for committing intimate partner violence against Jane Roe.[1]  The superior court denied his petition for writ of administrative mandate to set aside the expulsion.  He appeals, contending, among other things, that the process leading to his expulsion violated his right to a fair hearing.  We conclude USC's disciplinary procedures at the time were unfair because they denied Boermeester a meaningful opportunity to cross-examine critical witnesses at an in-person hearing.  We thus reverse and remand with directions to the superior court to grant the petition for writ of administrative mandate.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

Boermeester was a member of the USC football team, who kicked the game-winning field goal for USC at the 2017 Rose Bowl.  Roe was also a student-athlete who played tennis for USC.  Boermeester and Roe dated from March 2016 to approximately October 2016.  On January 21, 2017, two USC students observed Boermeester put his hand on Roe's neck and push her against a wall.  They reported this incident to the USC men's tennis coach, which resulted in the initiation of an investigation.  Boermeester did not deny he put his hand on Roe's neck and that she had her back

---

[1]     Although Jane Roe has identified herself to the public in the events at issue, we will continue to use a pseudonym or initials to refer to Roe and other witnesses in this opinion.  (Cal. Rules of Court, rule 8.90.)

[2]     Our recitation of facts is derived solely from the evidence in the administrative record, and not the declarations submitted by Boermeester that were not made part of the record.

against a wall while he did so.  He contends, however, he did not intend to harm her and they were merely "horsing around."

*Initial Interview with Jane Roe*

Roe agreed to meet with USC's Title IX office[3] on January 23, two days after the incident.  Roe's advisor was present.

Roe reported she spent the day with Boermeester on Friday, January 20, 2017.  He called to ask her to pick him up from a party at approximately 12:30 or 1:00 a.m. on January 21, 2017.  She did, and they returned to her home after getting food.  Boermeester was the drunkest she had ever seen.  He yelled in the alley behind her house, trying to be funny.

Roe had her dog, Ziggy, with her.  Boermeester wanted her to drop Ziggy's leash to allow him to run in the alley.  He grabbed the back of Roe's hair hard and said "drop the fucking leash."  Roe refused.  Boermeester responded by increasing his hold on Roe's hair, causing her to drop the leash because it "hurt."

Boermeester then grabbed Roe "tight" by the neck, causing her to cough.  He laughed and let go.  He grabbed her by the neck twice more and pushed her hard against a concrete wall that ran along the alley behind her duplex.  Roe's head hurt after she hit the wall.

Three USC students, DH, TS, and MB2, exited their apartments.  Roe believed they were woken up by the loud yelling.  When they asked after Roe, Boermeester told them that he and Roe

---

[3]     The University's Policy and Procedures on Student Sexual, Interpersonal, and Protected Class Misconduct (sexual misconduct policy) prohibits conduct such as intimate partner violence.  It is intended to comply with statutes prohibiting discrimination in education, including Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) (Title IX).  As a result, the office which implements the sexual misconduct policy is known as the Title IX office.

were just "playing around."  DH and TS, who lived on the other side of Roe in the duplex, took her into their apartment.  Boermeester was asleep when she got back to her room.

The next day, Roe told Boermeester that he scared DH and TS because "it looked really bad when you pushed me and it looked really bad with your hand around my neck."  He replied, "it was a joke, we were messing around, tell them to calm down" and added, "tell them you're into that," implying that it was foreplay.  When Roe asked him, "what if you hurt me bad?  Would you feel bad?  If you were playing around and it hurt?"  Boermeester told her, "no" because it would have been "brought on by" her.

The Title IX coordinator explained Roe had the option to request an avoidance of contact order (AOC) prohibiting Boermeester from contacting her.  Roe indicated she wanted the AOC as well as temporary emergency housing because Boermeester had a key to her house.  The investigator noted Roe was crying throughout the meeting.

Roe acknowledged she was in a "bad situation" but was conflicted about what to do because she still cared for Boermeester.  Roe indicated she did not want to participate in an investigation and did not want Boermeester to be charged with anything other than the January 21, 2017 incident.  She was informed the Title IX office was obligated to investigate and could proceed without her consent.  Boermeester was charged with the January 21, 2017 incident of intimate partner violence[4] for which there were eyewitnesses.

---

[4]     USC's sexual misconduct policy defines intimate partner violence as violence committed against a person with whom the accused student has a previous or current dating, romantic, intimate, or sexual relationship.  "Violence means causing physical harm to the person or to their possessions.  Intimate partner

4

*Boermeester is Notified of the Investigation*

On January 26, 2017, USC notified Boermeester of an investigation into the events of January 21 and that he may have violated USC's sexual misconduct policy by committing intimate partner violence. He was placed on interim suspension and received an AOC letter.

That day, Roe exchanged a series of text messages with the investigator stating, I am "pretty freaked out about today. I know I've said this a lot but I really can't emphasis [*sic*] enough that you guys please please make it clear that I did not bring this forward that I want nothing to do with it and I'm not pressing any charges." She further stated, "He can't know I made a statement. Can you not tell him I made a statement[?] Like he can't know I met with you guys." The investigator assured her Boermeester would be advised the investigation was initiated by the Title IX office and he would not be made aware of her statement until the time of the evidence review.

*Jane Roe Recants*

Roe and her advisor met with the investigator on January 30, 2017. Roe indicated she had reservations about the investigation because she felt as though her voice was not heard and that it was more about "burning him" than her wellbeing. Roe explained she thought she was in a supportive environment when she initially met with the Title IX office and so she freely shared her story. Although she understood the Title IX office was "trying to do the right thing,"

---

violence may also include non-physical conduct that would cause a reasonable person to be fearful for their safety; examples include economic abuse and behavior that intimidates, frightens, or isolates. It may also include sexual assault, sexual misconduct, or stalking. Intimate partner violence can be a single act or a pattern of conduct."

it has made things for her more "difficult." Roe felt bullied by the process and no longer "fully believe[d]" many of the statements she initially made to the Title IX office.

Roe also requested the AOC be lifted because she had changed her mind. She requested the AOC during her first meeting because she did not "trust" that it would be clearly conveyed to Boermeester that the investigation was initiated by the Title IX office, not her. She did not want Boermeester to be "mad" at her. She remarked "at the end of the day, he is like my best friend so it is like you are taking that away too." She explained, "you think this is to protect me. Feels like I lost control on everything and I feel like you are controlling who I can talk to." Roe stated that she did not feel she was in danger. She was upset they could not speak. She believed that the investigation was too harsh and that instead, Boermeester should be mandated to go to counseling and be placed on probation.

The next day, Roe texted the investigator, "Will I know tomorrow if I can get rid of my statement because I really don't want it used and I don't even think it is fair because I still disagree with somethings I said so to use it wouldn't be accurate and I just have been stressing about if it's being used or not so will [the coordinator] have an answer for me tomorrow?"

Meanwhile, media attention surrounding the suspension had begun. Roe's roommate reported Roe was worried about the impact the publicity would have on Boermeester's future career and NFL prospects. On February 8, Roe tweeted in response to media reports about Boermeester: "I am the one involved in the investigation with Matt Boermeester. The report is false. @Deadspin @latimes @ReignofTroy."

6

*Boermeester's Statement*

On January 30, 2017, Boermeester was interviewed by the investigator with a USC administrative assistant present. Boermeester's mother attended as his advisor. Boermeester generally confirmed the events of January 21 as Roe had described them; however, he denied intending to hurt her.

He reported he and Roe ate at the Cheesecake Factory at approximately 4:00 p.m. Later that night, he text messaged Roe to pick him up from a party because he was unable to drive. He had three glasses of wine at the restaurant and four to five beers at the party. When they arrived at Roe's home after picking up food, they began playfully throwing french fries at one another.

Boermeester wanted to watch Roe's dog run around so he asked her to let the dog go. They were standing by a wall when he instructed her to release the dog. He acknowledged he put his hand around her neck while she stood against the wall, but denied they were arguing or that he was angry. He also denied choking her or slamming her head against the wall. He believed Roe felt safe with him. He asserted he did not have a tight grip on her.

Boermeester reported he and Roe spent the next three nights together and were sexually intimate. They saw each other every day until she left for a tennis match on January 26, 2017. Boermeester recalled he and Roe laughed about TS and DH assuming it was "real violence."

Boermeester believed the eyewitnesses misinterpreted what they saw. Although he understood how it looked to them, he thought it was ridiculous they wanted her to spend the night over at their home rather than sleep with him.

He explained he and Roe sometimes put their hands on each other's necks during sex. When asked what impact this has had on him, he stated, "I know to never do anything that resembles domestic violence in public again. To be aware of my surroundings." The investigator asked, "just in public?" He responded, "Well no, just to never give the impression of domestic violence." Boermeester stated, "I feel like a monster even though I didn't do anything. I can't go to class, rehab, etc. I'm kinda sleeping, it's on my mind all of the time."[5]

On February 14, 2017, the Title IX office notified Boermeester he would also be investigated for violating the AOC. He provided a written response by email denying contact with Roe in any format. He asserted he had moved home to San Diego and had remained there aside from meeting with his lawyer.

*Additional Witness Statements*

USC's Title IX investigator interviewed over a dozen people, including Roe, Boermeester, the eyewitnesses, Roe's roommates and friends, and Boermeester's ex-girlfriend. The investigator made it a general practice to re-read the statement to the person after the interview to confirm accuracy.

MB2 is Roe's neighbor. He initially reported he did not see any physical contact between Roe and Boermeester. He explained he heard an argument between a man and a woman about a dog. When he walked outside to take out his trash and see what was happening, "it kinda settled a little bit." Roe approached him a few days later to ensure he did not get the wrong impression.

---

[5] Boermeester had knee surgery in early January 2017 and was scheduled to receive rehabilitation and physical therapy from USC staff. The Title IX office noted his treatment at USC facilities was not prohibited by the interim suspension.

One month later, MB2 called the investigator to admit he had not been truthful in his initial statement because he was trying to "protect" Roe's wishes to "keep it on the down low" and "downplay" the incident. He explained Boermeester's attorney attempted to speak with him at his home in March 2017. He told the attorney what he initially told the Title IX investigator. However, he decided, "the lawyer coming to speak to me, finding my apartment, I don't want to keep this any longer, perpetuating this lie."

During a second interview, MB2 reported he heard laughing and screaming sounds coming from the alley by his home, which initially seemed playful. The noise then changed to what sounded like a male trying to "assert his dominance" over a female. MB2 looked into the alley and saw Boermeester standing in front of Roe with both hands around her neck. He then pushed her into the alley wall and she began to make "gagging" noises. MB2 added, "once he put his arms around her the first time she wasn't saying anything." MB2 believed, "this guy is violent. He domestically was abusing her." He stated, "truth is I really wanted to beat the shit out of this guy." Because of what he saw, MB2 grabbed a trash bag and went outside. He asked them how things were going, which "broke it up." Afterwards, Boermeester and Roe walked back to her apartment.

DH is a member of the USC men's tennis team and Roe's neighbor. He was reluctant to participate in the investigation but described what he saw on the night of January 21, 2017. He reported he heard screaming. He heard a male voice yelling loudly and a female voice talking but could not make out what they were saying. He looked outside and saw Roe and Boermeester standing by the wall. He noticed Roe's dog running in the alley, which made him realize something was wrong because Roe did not allow her dog to run freely. He saw Roe pinned against the wall by

9

Boermeester, who had his hand around her chest/neck. DH did not see or hear Roe hit the wall.

TS is also a member of the USC men's tennis team and is DH's roommate. He reported DH woke him up, urgently stating, "we gotta go downstairs, [Boermeester] is hitting [Roe]." When they got downstairs, DH asked to speak to Roe. Boermeester walked back to Roe's house. DH tried to convince her to spend the night at their apartment. DH observed Roe was "playing casual at first" and tried to "downplay it." When DH confronted her about Boermeester's arm around her throat, she rationalized it by saying, "he's just drunk." About 15 to 20 minutes later, Roe returned home, crying. She then texted that Boermeester was asleep and stated, "I am safe. Thanks for looking out for me." TS and DH reported the incident the next day to the men's tennis coach.

Roe's roommates and friends uniformly reported that Roe and Boermeester's relationship was volatile, but they did not personally witness any physical violence between them. Most of them did not believe Roe was in any physical danger. Instead, they often heard Roe and Boermeester demean one another by calling each other names. As the investigation progressed, Roe indicated to her friends she did not want them to participate in the investigation.

Roe stated in a text message to TS, "Look what I want to say is I'm helping Matt. I know you won't agree with it but he's already gotten a shit ton of punishment for something I didn't want to happen in the first place. I wanted non[e] of this to take place at all. He's already suspended for probably two months and will be kicked off the team and has a restraining order from me. I literally wanted non[e] of it so what I'm asking as a friend is don't say much. Please don't fuck him over more. I'm not in danger at all I trust him I trust

10

that he won't ever hurt me again.  I just hate that any of this is going on.  So I'm begging you."

Roe confided in a few friends that Boermeester had given her bruises.  A text message from Roe to GO also indicated Roe may have been in contact with Boermeester while the AOC was in place.

Boermeester's ex-girlfriend, AB, dated him for almost three years.  She reported she and Boermeester would wrestle and joke around.  It sometimes started as tickling but would end in him placing her in a "chokehold."  She would tell him to stop and he did.  She estimated he had his hands around her neck five to ten times.  When Boermeester placed his hands around her neck, "it crossed the line from being joking and then it would be too much."  On two occasions, he shoved her during an argument.

AB's mother thought their rough housing was "always [going] too far."  She "freaked out" when she saw Boermeester with his hands around AB's neck and screamed, "get your arms off [my] daughter right now!"  Boermeester apologized, but AB did not think he realized he was "definitely too rough."  Nevertheless, AB did not believe her parents were concerned about her safety when she was dating Boermeester.

*Surveillance Video*

The investigator retrieved surveillance video of the incident from a camera located in the alley approximately two buildings away from Roe's duplex.  The recording does not contain audio and is grainy.  It is undisputed the video depicts Boermeester and Roe interacting in the alley after midnight on January 21, 2017.  The video supports the trial court's description of the events as follows:

"At 12:16:16 a.m., the video shows Petitioner shoving Roe from the area adjacent to the house into the alleyway.  At 12:16:50, Petitioner appears to be holding Roe's neck or upper body area.

11

At 12:17:12, Petitioner grabs Roe by the neck and pushes her toward the wall of the alley. At 12:17:13 and 112:17:14, Roe's head and body arch backwards. Between 12:17:16 and 12:17:26, Petitioner and Roe are against the wall and barely visible from the camera. At 12:17:26, Petitioner backs away from the wall and re-enters the camera's view. At 12:17:28, Roe re-enters the camera's view. Roe and Petitioner proceed to push each other. At 12:17:38, Petitioner moves toward Roe and appears to be pushing her against the wall. At 12:17:40, a dog can be seen running across the alley. At 12:17:57, a third party enters the camera's view and walks in the direction of Petitioner and Roe. At that moment, Petitioner and Roe walk away from the wall and back towards the house. At 12:18:19, the third party walks over to the dumpster, places a trash bag inside, and walks back toward the house."

*USC's Findings and Disciplinary Action*

Based on the evidence obtained, the investigator found Boermeester violated USC's misconduct policy by engaging in intimate partner violence and violating the AOC. The investigator submitted her findings to the Misconduct Sanctioning Panel, which is comprised of two staff or faculty members and an undergraduate student. The panel decided upon a sanction of expulsion.

Boermeester appealed the findings of fact and determination of violation to the Vice President for Student Affairs. An appellate panel found the evidence supported the findings, but recommended a two-year suspension because Boermeester's conduct could have been "reckless" rather than intentional. The Vice President for Student Affairs rejected the appellate panel's recommendation and affirmed the decision to expel Boermeester, reasoning the sanction was appropriate under the sexual misconduct policy regardless of whether Boermeester intended to harm Roe or not.

*Proceedings in the Superior Court*

Boermeester filed a petition for writ of mandate in the Superior Court under Code of Civil Procedure section 1094.5. The court denied the petition for writ of mandate. Boermeester appealed.

## DISCUSSION

Boermeester contends he was denied notice of the allegations against him and that interim measures were improperly imposed. We find these contentions meritless.[6] Boermeester also contends he was entitled to a live evidentiary hearing where he can cross-examine witnesses. We find Boermeester's fair hearing argument supported by caselaw and thus reverse and remand.

Because we conclude Boermeester was deprived of a fair hearing for lack of a meaningful opportunity to cross-examine critical witnesses at an in-person hearing, we decline to address whether USC's policy was also unfair because the Title IX investigator held the dual roles of investigator and adjudicator. We also need not address Boermeester's other claims of error, including whether substantial evidence supported USC's findings.

---

[6] To the extent Boermeester argues USC's Title IX office was biased against him, an argument that appears throughout his appellate briefs, he has presented no legal or factual basis to support this argument other than to say its decisions were not in his favor. Boermeester has failed to meet his burden to demonstrate prejudicial error in this regard. (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.) Boermeester also complains Roe was not provided proper notice she was a suspected victim and intended reporting party in the proceedings. Boermeester lacks standing to assert Roe's rights in this matter. (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 175; see Code Civ. Proc., § 367.)

# I. Standards of Review

In an appeal from a judgment on a petition for writ of mandate, the scope of our review is the same as that of the Superior Court, that is, we review the agency's decision rather than the Superior Court's decision. (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*USC I*).) We determine "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid*.)

"The statute's requirement of a ' "fair trial" ' means that there must have been 'a fair administrative hearing.' " (*Gonzalez v. Santa Clara County Department of Social Services* (2014) 223 Cal.App.4th 72, 96.) "A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law." (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.) However, we review for substantial evidence USC's substantive decisions and factual findings. (*USC I, supra,* 246 Cal.App.4th at p. 239; Code Civ. Proc., § 1094.5, subd. (c).)

# II. Boermeester Received Sufficient Notice

Boermeester complains he was not provided full notice that the Title IX investigation would "extend to his entire relationship history with [Roe], nor his relationship history with a previous girlfriend who did not attend USC." Thus, he claims he was unaware the investigator was "collecting evidence to support her opinion about an alleged 'pattern' of intimate partner violence, nor

14

that he needed to produce evidence to combat [the investigator's] preconceived notions about domestic violence." We disagree.

"Generally, a fair procedure requires 'notice reasonably calculated to apprise interested parties of the pendency of the action . . . and an opportunity to present their objections.' [Citations.] With respect to student discipline, '[t]he student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences . . . Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.' [Citation.] [¶] 'At the very minimum, therefore, students facing suspension . . . must be given *some* kind of notice and afforded *some* kind of hearing.' [Citation.] The hearing need not be formal, but 'in being given an opportunity to explain his version of the facts at this discussion, the student [must] first be told what he is accused of doing and what the basis of the accusation is.' [Citation.]" (*USC I, supra,* 246 Cal.App.4th at p. 240, quoting *Goss v. Lopez* (1975) 419 U.S. 565, 579–580 (*Goss*).)

Here, USC's misconduct policy provides that an accused student be given "[w]ritten notice of the alleged policy violation including the specific acts, the date/period of time, and [the] location [where the act allegedly occurred]." Boermeester acknowledges USC complied with this policy. Indeed, USC informed him on January 26, 2017, that it was investigating a report he committed intimate partner violence, "specifically, grabbing Jane Roe by the neck, and pushing her head into a cinder block wall multiple times on/or about

15

January 21, 2017." He was later notified of a second policy violation, "specifically, contacting and communicating with [Roe] via text, phone call, social media, and in-person since the issuance of the Avoidance of Contact Order issued by Dr. Lynette Merriman and served on you January 26, 2017."

Boermeester reviewed the evidence compiled by the investigator and responded to both allegations by written statement. In his response, he complained about the interview with his ex-girlfriend and contended her statement was "completely irrelevant to the evidence relating to what happened on January 21, 2017." Boermeester also viewed text messages from Roe to GO in which she indicated she had been in contact with him after issuance of the AOC. After reviewing the evidence related to the AOC violation, Boermeester responded by denying he had contact with Roe.

Boermeester's written statements belie his contention that he did not get notice of the extent of the investigation into his actions. Boermeester was not only provided notice of the factual basis of the allegations against him, he was also provided with a meaningful opportunity to respond to them. We find that is sufficient notice of the violations with which he was charged. (*USC I, supra,* 246 Cal.App.4th at pp. 240–241.)

## III.   The Interim Suspension Was Not Unfair

Boermeester next argues his interim suspension was "patently unfair" because it was imposed without a hearing and he was not provided with the evidence supporting it. In his reply brief, Boermeester asserts the evidence was insufficient to support the interim suspension. We are not persuaded.

*Goss, supra,* 419 U.S. 565, cited by Boermeester, supports our conclusion. *Goss* recognized the need for interim measures, allowing for the immediate removal of a student without notice or hearing if

16

the student "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process . . ." (*Id.* at p. 582.) It held an accused student must be given "*some* kind of notice and afforded *some* kind of hearing" when faced with disciplinary proceedings. *Goss* did not hold a student was entitled to two different notices and two different hearings if interim measures were also imposed. (*Id.* at pp. 579–580.)

USC's policy comports with *Goss.* It states that interim protective measures, including interim suspension, may be imposed when there is information the accused student poses a substantial threat to the safety or well-being of anyone in the university community. In deciding whether to impose interim protective measures, the policy sets forth specific factors for consideration, including whether the reported behavior involved the use of a weapon or force, the risk of additional violence or significant disruption of university life or function, whether there have been other reports of prohibited conduct by the respondent, and the university's obligation to provide a safe and non-discriminatory environment. It further states, "[a] student or organization subject to interim protective measures is [to be] given prompt written notice of the charges and the interim measure. An opportunity for review of the measure is provided within 15 days of the notice by the *Vice President for Student Affairs* or designee."

Consistent with its policy, USC provided Boermeester with notice of the charges against him and a review of the interim suspension. Boermeester was notified of the charges against him, the interim suspension, and the AOC, by letter dated January 26. The letter advised him to schedule a meeting with the Title IX investigator, at which time he would be able to "review the basis for the investigation," review his procedural rights, ask questions,

17

provide a statement, and submit relevant information or the identity of potential witnesses.  Thereafter, on January 30, Boermeester met with the investigator.  The record shows USC reviewed the basis for the investigation with him at the meeting.  On the same day, Boermeester requested the interim suspension be discontinued or modified because two witnesses "misinterpreted" the incident and because it placed an undue burden on him.  The request was denied by USC's Vice President of Student Affairs on January 31.  In sum, Boermeester was informed of the evidentiary basis for the interim suspension and was provided with a hearing.  His contentions to the contrary are thus meritless.

It appears Boermeester is actually asserting USC should have provided him with a preliminary hearing prior to the full evidentiary hearing.  However, Boermeester presents no authority for this proposition.  Nor does he present any authority for the proposition USC was required to share its ongoing investigation with him.

In his reply brief, Boermeester asserts there was insufficient evidence he posed a threat to Roe or any other student to support the interim suspension.  As an initial matter, we may disregard arguments raised for the first time in a reply brief.  (*WorldMark, The Cloud v. Wyndham Resort Development Corp.* (2010) 187 Cal.App.4th 1017, 1030, fn. 7.)  In any case, sufficient evidence supported the interim suspension.  Roe stated Boermeester pulled her hair, pushed her against a wall, and put his hand on her neck.  DH's statements supported Roe's version of the events.  Further, Boermeester admitted he had his hand on her neck and she was against a wall.  While there was also evidence Boermeester did not pose a threat to Roe, we decline to reweigh the evidence.

18

**IV. Fair Procedure Requires Boermeester Be Given the Opportunity to Cross-Examine Critical Witnesses at An In-Person Hearing**

We find meritorious Boermeester's contention that he should have had the right to cross-examine the witnesses against him at an in-person hearing. In reaching this conclusion, we reject a number of forfeiture-related arguments advanced by USC and the dissent. We also find the errors identified are not harmless. We thus reverse and remand.

**A. Relevant Legal Authorities**

California has long recognized a common law right to "fair procedure" when certain private organizations have rendered a decision harmful to an individual. (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061 (*Allee*); *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1232, n. 25; *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 56 (*UC Santa Barbara*); *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1729–1730.) Courts have applied the right to fair procedure to disciplinary proceedings involving sexual misconduct by students at private universities.[7] These opinions uniformly hold the disciplinary

---

[7] Unlike private universities, the requirements for disciplinary hearings at public universities are grounded in constitutional due process principles. (*Allee, supra,* 30 Cal.App.5th at p. 1061.) Some courts have observed that the common law requirements for a fair disciplinary hearing at a private university "mirror" the due process protections that must be afforded a student at a public university. (*Ibid.*) Other courts merely find due process jurisprudence "instructive" in cases involving private universities. (*Claremont McKenna, supra,* 25 Cal.App.5th at p. 1067, fn. 8.) In either case, we may rely on cases involving public university disciplinary proceedings.

proceedings need not include all of the safeguards and formalities of a criminal trial and the formal rules of evidence do not apply. (*Allee, supra,* 30 Cal.App.5th at p. 1062; *UC Santa Barbara, supra,* 28 Cal.App.5th at p. 56.)  Instead, fair hearing requirements are " 'flexible,' " and do not mandate any " 'rigid procedure.' "  (*Allee, supra*, 30 Cal.App.5th at p. 1062.)

Courts also agree fundamental fairness requires the accused be given " ' "a full opportunity to present his defenses." ' "  (*Allee, supra,* 30 Cal.App.5th at p. 1062, quoting *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1104 (*UC San Diego*).)  A university must balance its desire to protect victims of sexual misconduct with an accused's need to adequately defend himself or herself.  Added to these competing interests is the university's desire to avoid diverting its resources and attention from its main calling, which is education.  (*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1066 (*Claremont McKenna*).)  " "Although a university must treat students fairly, it is not required to convert its classrooms into courtrooms.' "  (*UC San Diego, supra*, 5 Cal.App.5th at p. 1078.)

In examining what kind of hearing comports with fair procedure, California courts have concluded a university must provide the following to the parties involved in a sexual misconduct disciplinary proceeding: notice of the charges and the university's policies and procedures (*USC I, supra,* 246 Cal.App.4th at p. 241); compliance with those policies and procedures (*UC San Diego, supra,* 5 Cal.App.5th at p. 1078); access to the evidence (*UC Santa Barbara, supra,* 28 Cal.App.5th at pp. 57–59); an in-person hearing that includes testimony from critical witnesses and written reports of witness interviews (*Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 637 (*Westmont College*); and direct or indirect

20

cross-examination of critical witnesses in cases where credibility of the witnesses is central to a determination of misconduct (*Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 224 (*Occidental College)*; *Allee, supra*, 30 Cal.App.5th at p. 1039).

### B. USC's Sexual Misconduct Policy in 2017

USC's student handbook includes its policies and procedures governing investigations into student sexual misconduct.[8] Stalking and intimate partner violence were identified as some of the prohibited conduct. USC's policy dictated an investigation was to be a "neutral, fact-finding process. Reports [were] presumed to be made in good faith. Further, Respondents [were] presumed not responsible." The presumption of non-responsibility was overcome when a preponderance of evidence established the respondent committed the prohibited conduct.

The handbook required the Title IX office to contact the reporting party and the respondent at the initiation of an investigation to explain their rights and to schedule a meeting.[9] An investigator was assigned to the matter and interviewed witnesses and assembled other evidence.

The rules of evidence and discovery generally did not apply. Sexual history was relevant "[w]hen there [was] evidence of substantially similar conduct by a Respondent, regardless of a finding of responsibility." The sexual history evidence could be used

---

[8] USC's sexual misconduct policy has been amended since 2017. However, we review the policy as it existed at the time of the disciplinary proceedings against Boermeester.

[9] Regardless of who reported the student misconduct, USC designated the individual who experienced the prohibited conduct as the "reporting party." The "respondent" was the individual accused of committing the misconduct.

"in determining the Respondent's knowledge, intent, motive, absence of mistake, or modus operandi[.]"

After the investigation, the parties could review the evidence in a process known as "Evidence Review." Once the parties completed Evidence Review, the Title IX coordinator and assigned investigator conducted separate hearings, known as "Evidence Hearings," where each party could present a statement or evidence at the Title IX offices. Each party was permitted to submit questions to be asked by the Title IX coordinator at the other party's Evidence Hearing. The Title IX coordinator had discretion to exclude inflammatory, argumentative, or irrelevant questions. Any "new information" shared by a party during the Evidence Hearing was relayed to the other party for a response.

After the Evidence Hearing, the Title IX office prepared a Summary Administrative Review (SAR), which presented and analyzed the information collected. The investigator made findings of fact in consultation with the Title IX coordinator and using a preponderance of the evidence standard, determined whether a violation occurred.

A "Misconduct Sanctioning Panel," comprised of three members of the USC community, determined the appropriate discipline after review of the SAR. The parties could appeal the disciplinary action to USC's Vice President for Student Affairs. An appellate panel, comprised of three anonymous individuals from the USC community, reviewed the appeal and made a recommendation to the Vice President for Student Affairs, who could accept or reject the recommendation.

## C. Forfeiture

We address the threshold issue of whether Boermeester has preserved his right to assert on appeal that he was improperly

denied cross-examination of witnesses at a live evidentiary hearing. We find he has.

USC contends Boermeester forfeited the issue when he failed to request cross-examination of third-party witnesses and waived it when he refused to submit written questions for Roe. We decline to fault Boermeester for failing to request cross-examination of other witnesses because such an objection was not supported by the law at the time and would have been futile in any case. (*People v. Brooks* (2017) 3 Cal.5th 1, 92 [" 'Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence.' "]; see also *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1334 ["An appellant may challenge the admission of evidence for the first time on appeal despite his or her failure to object in the trial court if the challenge is based on a change in the law that the appellant could not reasonably have been expected to foresee."].)

At the time of these disciplinary proceedings in 2017, neither the law nor USC's sexual misconduct policy contemplated cross-examination of third-party witnesses at an in-person hearing. *Allee,* which extends cross-examination rights to third-party witnesses, was not published until January 4, 2019. In 2016, the existing law on this point was set forth in *USC I*, which cited with approval a case that held, " '[a]lthough we recognize the value of cross-examination as a means of uncovering the truth [citation], we reject the notion that as a matter of law every administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses.' " (*USC I, supra*, 246 Cal.App.4th at

p. 245.)  Under these circumstances, Boermeester could not reasonably have been expected to foresee *Allee's* holding.[10]

Moreover, any objection would have been futile because the Title IX office had made it clear they were not going to deviate from USC's sexual misconduct policy and procedures.  This is demonstrated by USC's denial of Boermeester's request that Roe's answers to his questions at the Evidentiary Hearing be transmitted to him "unfiltered," meaning verbatim, and prior to the SAR.  The Title IX coordinator replied, "The process does not afford that.  Please review our policy."  It is reasonable to conclude a request to question other witnesses would likewise have been denied and an objection is futile under such circumstances.  (See *People v. Hopkins* (1992) 10 Cal.App.4th 1699, 1702 [after mistrial objection overruled on a legal ground, defense counsel could reasonably have believed further objections would be fruitless]; *In re Antonio C.* (2000) 83 Cal.App.4th 1029, 1033 ["[W]here an objection would have been futile, the claim is not waived."].)

Because we conclude Boermeester did not forfeit his right to cross-examine third-party witnesses, we likewise conclude there was no waiver of his right to an in-person hearing.

---

[10]  The dissent asserts Boermeester could have foreseen *Allee* because his attorney also represented the accused student in *Allee*. In 2019, Boermeester's attorney persuaded the *Allee* court to rely on *Doe v. University of Cincinnati* (S.D. OH 2016) 223 F.Supp.3d 704, 711, which held that cross-examination was essential in student disciplinary proceedings.  As discussed above, however, California authority was to the contrary when Boermeester's proceedings occurred.  (*USC I, supra*, 246 Cal.App.4th at p. 245.)  Boermeester's attorney in 2017 could not have foreseen that California law would change in 2019 as a result of an Ohio case.  We decline to charge attorneys with such foresight.

24

We also decline to find forfeiture based on Boermeester's refusal to submit questions for Roe. The record shows Boermeester did object to the process by which Roe would be questioned. Specifically, he asked for Roe's answers to be relayed to him "unfiltered" or word-for-word so he could use them in his formal statement to USC. He explained, "The failure to record or transcribe any of the interviews and the admission by at least one witness that he lied during his initial interview [referring to MB2] have shaken our confidence in the accuracy of this investigation." Boermeester declined to submit questions for Roe only after his request was rejected.

Given these circumstances, Boermeester did not waive the right to raise the issue of Roe's cross-examination on appeal. (See *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 299–300, fn. 17 [no waiver where objection was overruled and objecting party attempted to minimize impact of admission of evidence].) To the extent USC contends Boermeester's objection was insufficiently specific, that is, he failed to object on the ground he could not question Roe at an in-person hearing, we conclude that objection was not supported by the law at the time and would have been futile for the same reasons specified above.

We do not find persuasive the dissent's invited error analysis. An error is invited when a party purposefully induces the commission of error. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.) The doctrine of invited error bars review on appeal based on the principle of estoppel. (*Ibid.*) The doctrine is intended to prevent a party from misleading a trial court to make a ruling, and then profit from it in the appellate court. (*Ibid.*)

The dissent accuses Boermeester of making a tactical decision when he refused to submit questions for Roe. The record shows

Boermeester only declined to question Roe further after his request to receive verbatim answers before the SAR was denied.  The record does not demonstrate it was a tactical decision designed to induce USC to make an erroneous decision that Boermeester could then challenge on appeal.  Instead, the record demonstrates a disagreement about the process by which Roe would be questioned.

It is clear Boermeester merely abided by USC's established rules and procedures.  USC's policy did not allow for Roe to be questioned at an in-person hearing that Boermeester could attend.  Neither did it contemplate questioning third party witnesses at an in-person hearing.  The doctrine of invited error does not apply when a party, while making the appropriate objections, acquiesces to an established procedure such as this one.  (See *K. G. v. County of Riverside* (2003) 106 Cal.App.4th 1374, 1379 [" ' " 'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.' " [Citations.]' "].)  Here, Boermeester objected to the format of his questions to Roe and we find that any request to question third party witnesses would have been futile.  Boermeester did not invite the error by acquiescing to USC's sexual misconduct procedure.

Finally, we reject the contention Boermeester forfeited this issue when he failed to raise it in his administrative appeal.  Boermeester was prohibited from arguing the proceedings were unfair in his administrative appeal.  An appeal on this basis would have been futile.  (*In re Antonio C., supra,* 83 Cal.App.4th at p. 1033.)

### D. Merits

We now reach the merits of Boermeester's challenge to the fairness of the disciplinary proceedings against him. Relying on *Allee, supra,* 30 Cal.App.5th at page 1039, he primarily takes issue with the investigator's "overlapping and conflicting" roles in the proceedings and the denial of his right to cross-examine witnesses. (*Id.* at p. 1069.)

*Allee* involved a student's expulsion from USC for nonconsensual sex with another student. Division 4 of this court concluded USC's disciplinary procedure failed to provide the accused student with a fair hearing. (*Allee, supra*, 30 Cal.App.5th at 1039.) The *Allee* court held that "when a student . . . faces severe disciplinary sanctions, and the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation, fundamental fairness requires, at a minimum, that the university provide a mechanism by which the accused may cross-examine those witnesses, directly or indirectly, at a hearing at which the witnesses appear in person or by other means (e.g., videoconferencing) before a neutral adjudicator with the power independently to find facts and make credibility assessments." (*Id.* at p. 1069.)

At the time of the disciplinary proceedings in *Allee*, USC's sexual misconduct policy did not require an in-person hearing and the Title IX investigator served multiple roles in the proceedings. (*Allee, supra,* 30 Cal.App.5th at p. 1069.) The *Allee* court found fault with the investigator's "unfettered" discretion to conduct the investigation, determine credibility, make findings of fact, and impose discipline. (*Id.* at p. 1070.)

The court reasoned, "The notion that a single individual, acting in these overlapping and conflicting capacities, is capable of

27

effectively implementing an accused student's right of cross–examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross-examination: adversarial questioning at an in person hearing at which a neutral fact finder can observe and assess the witness' credibility." (*Allee, supra,* 30 Cal.App.5th at p. 1068.) The court concluded, "a right of 'cross-examination' implemented by a single individual acting as investigator, prosecutor, factfinder and sentencer, is incompatible with adversarial questioning designed to uncover the truth. It is simply an extension of the investigation and prosecution itself." (*Ibid.*)

Since *Allee,* Divisions 6 and 7 of this court have reached similar conclusions regarding the need for some form of cross-examination at a live hearing. In *Westmont College, supra,* 34 Cal.App.5th 622, a student was suspended after a three-member panel determined the evidence supported an accusation he sexually assaulted another student. The trial court granted the accused student's petition for a writ of administrative mandamus on the ground the college did not give him a fair hearing. (*Id.* at p. 625.)

Division 6 affirmed, finding the college's investigation and adjudication of the complainant's accusation "was fatally flawed." (*Westmont College, supra,* 34 Cal.App.5th at p. 625.) The Court of Appeal found fault with the panel's failure to hear testimony from critical witnesses, even though it relied on their prior statements to corroborate the complainant's account and to impeach the accused's credibility. It also found the panel improperly withheld material evidence from the accused that its own policies required it to turn over and did not give the accused the opportunity to propose questions to be asked of the complainant and other witnesses. (*Id.* at pp. 625–626, 636–639.) Because the record indicated two panel

28

members relied on the credibility determination of the investigator, who was the third panel member, the court also held each member of the panel must hear from the critical witnesses—in person, by videoconference, or some other method—before assessing credibility. (*Id.* at p. 637.)

In *Occidental College, supra,* 40 Cal.App.5th 208, Division 7 applied the holding in *Westmont* and found a student expelled for sexual assault had received a fair hearing. In *Occidental College,* an external adjudicator heard testimony from the parties, the investigator, and five witnesses during a live hearing. The adjudicator recommended disciplinary action after considering the testimony, summaries of witness interviews, and the investigative report. (*Occidental College, supra,* at p. 219.) The court found "Occidental's policy complied with all the procedural requirements identified by California cases dealing with sexual misconduct disciplinary proceedings: both sides had notice of the charges and hearing and had access to the evidence, the hearing included live testimony and written reports of witness interviews, the critical witnesses appeared in person at the hearing so that the adjudicator could evaluate their credibility, and the respondent had an opportunity to propose questions for the adjudicator to ask the complainant." (*Id.* at p. 224; accord *Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070 ["where the accused student faces a severe penalty and the school's determination turns on the complaining witness's credibility . . . the complaining witness must be before the finder of fact either physically or through videoconference or like technology to enable the finder of fact to assess the complaining witness's credibility in responding to its own questions or those proposed by the accused student"].)

We agree with the above authorities:  In a case such as this one, where a student faces a severe sanction in a disciplinary proceeding and the university's decision depends on witness credibility, the accused student must be afforded an in-person hearing in which he may cross-examine critical witnesses to ensure the adjudicator has the ability to observe the witnesses' demeanor and properly decide credibility.  (*Occidental College, supra,* 40 Cal.App.5th at p. 224; *Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070; *Allee, supra,* 30 Cal.App.5th at p. 1066.)  In reaching this conclusion, we agree with the prevailing case authority that cross-examination of witnesses may be conducted directly by the accused student or his representative, or indirectly by the adjudicator or by someone else.  (*Ibid.*)  We further agree the cross-examiner has discretion to omit questions that are irrelevant, inflammatory, or argumentative.  (*UC San Diego, supra,* 5 Cal.App.5th at pp. 1086–1087.)

Although we refer to an "in-person hearing," we do not mean to say that the witnesses must be physically present to allow the accused student to confront them.  Instead, the witnesses may appear in person, by videoconference, or by another method that would facilitate the assessment of credibility.  (*Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070; *Doe v. Univ. of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 406 (*Univ. of Cincinnati*) [university's procedures need only provide "a means for the [review] panel to evaluate an alleged victim's credibility, not for the accused to physically confront his accuser."].)

Boermeester did not receive this type of hearing under USC's 2017 sexual misconduct policy.  USC's policy to hold separate Evidentiary Hearings and limit cross-examination does not meet the

fair procedure requirements identified in *Allee, Westmont College, Occidental College,* and *Claremont McKenna.*

Under the separate Evidentiary Hearing procedure, the reporting party could respond to the evidence collected and answer any questions submitted by the respondent without the respondent's presence. This procedure effectively denied Boermeester a hearing. An accused student is not given a meaningful opportunity to respond to the evidence against him if he is not allowed to attend the very hearing at which the evidence is presented. (*Goldberg v. Regents of University of Cal.* (1967) 248 Cal.App.2d 867, 882 [due process requires students be "given ample opportunity to hear and observe the witnesses against them"].)

Even if the Evidence Hearings were not separate and Boermeester was allowed to attend, the limited cross-examination afforded by USC prevented him from fully presenting his defense, as required by fair procedure. (*UC San Diego, supra,* 5 Cal.App.5th at p. 1104.) Under the sexual misconduct policy, Boermeester could only submit questions for Roe to be asked by the Title IX coordinator at the Evidence Hearing. Boermeester had no opportunity to question any other witness or ask follow-up questions of Roe. These limitations prevented Boermeester from fully presenting his defense, which was that the eyewitnesses misunderstood what happened between him and Roe on January 21, 2017. Allowing Boermeester to submit questions for critical witnesses, such as AB, MB2, DH, and TS, at a live hearing would further truth finding by allowing him to test their recollection, their ability to observe the incident, and any biases they may have. It is well established " 'cross-examination has always been considered a most effective way to ascertain truth.' " (*Univ. of Cincinnati, supra,* 872 F.3d at pp. 401–402.)

31

In short, an in-person hearing coupled with indirect or direct cross-examination would enable the adjudicator to better assess witness credibility in a case where credibility is central to a determination of sexual misconduct. (*Univ. of Cincinnati, supra,* 872 F.3d at pp. 401–402; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358 ["Oral testimony of witnesses given in the presence of the trier of fact is valued for its probative worth on the issue of credibility, because such testimony affords the trier of fact an opportunity to observe the demeanor of witnesses."]; *Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 586.)

USC contends the holdings in *Allee* and the other university sexual misconduct cases should not be extended to an intimate partner violence case on the ground those cases only apply to sexual assault or similar sexual misconduct. According to USC, cross-examination is required in sexual misconduct cases because the misconduct takes "place behind closed doors, with no witnesses other than the parties, and the key issue in dispute [is] consent." USC claims the situation is different here because the misconduct "took place in public, was witnessed by at least two individuals, and was captured on video."

The dissent similarly distinguishes a university sexual misconduct case from an intimate partner violence case. In a sexual misconduct case, according to the dissent, the accused seeks cross-examination to "shake" the accuser's story that their sexual encounter was not consensual. The dissent asserts the sexual misconduct case is different because it does not involve a domestic relationship and the victim does not recant.

We disagree. Sexual misconduct cases may also arise from domestic relationships and victims also recant in such cases. Further, from a procedural standpoint, we see little difference

32

between a sexual misconduct case such as that described by USC and the dissent and an intimate partner violence case such as this one. Both cases require the university to make credibility determinations based on conflicting statements. It is irrelevant to us whether the conflict exists because the man and the woman have competing narratives or the man and woman's narrative competes with that of third party witnesses.

USC was presented with two versions of the January 21 incident. On the one hand, Roe and Boermeester claimed it was playful and not violent. On the other hand, the third party witnesses and Roe, in her initial statement, claimed it was violent and not playful. Given this conflict, "the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation" in this case, just as it was in *Allee* and the other university sexual misconduct cases. (*Allee, supra,* 30 Cal.App.5th at p. 1069; see also *Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070.)

We acknowledge the dissent's point that Roe had recanted and it may or may not have benefitted Boermeester to question her further. However, as USC indicates, it was not Roe, but the eyewitnesses, who were pivotal to USC's decision. According to USC, they provided the necessary support for Roe's initial account. Thus, even absent cross-examination of Roe, Boermeester should have been able to cross-examine the third-party witnesses to test their recollection, their ability to observe the incident, and any biases they may have had against him.

USC claims credibility of witnesses was not central to the adjudication in this case due to the extensive corroborating evidence, including the video tape. USC overstates the evidence. The surveillance video is not conclusive. The picture is grainy and there

33

is no audio.  The video camera is positioned approximately two buildings away from Roe and Boermeester.  They are small figures in the frame of the video.  Additionally, there is a light on the left side of the frame, which renders the interaction between Boermeester and Roe when they are near the wall barely visible.  At best, the video corroborates Roe's initial statement, MB2's second statement, and DH's statement of what occurred on January 21, 2017.  However, both Roe and MB2 recanted their initial statements to the investigator.  Contrary to USC's assertion, adjudication of this matter rests on a determination of the credibility of inconsistent witnesses, just as in *Allee, Occidental College,* and *Westmont College.*  Accordingly, these authorities apply to this intimate partner violence case.

We likewise find unpersuasive USC's argument that sexual assault and other sexual misconduct violations are different from violations involving intimate partner violence and thus should be treated differently.  USC's own student handbook describes only four "categories" of student misconduct:  (1) non-academic violations; (2) academic integrity violations; (3) admissions violations; and (4) sexual, interpersonal, and protected class misconduct cases.  Under the "University's Policy and Procedures on Student Sexual, Interpersonal, and Protected Class Misconduct," the same investigative and adjudicative procedure applies to each violation, including "sexual assault and non-consensual sexual contact," harassment, stalking, and intimate partner violence.  In short, USC does not treat sexual misconduct and intimate partner violence cases differently.  Neither does fair procedure.

### E. Harmless Error

Lastly, USC asserts any error was harmless, arguing, "[n]o amount of additional process would change what can be plainly

observed on the security footage and confirmed in Boermeester's own statements." We are not convinced. As we have discussed, USC overstates what the surveillance video shows. At best, it corroborates Roe's initial statement. Moreover, although Boermeester admits he put hands on Roe's neck while she was positioned against the wall, he asserts it was playful. This is hardly a confession to intimate partner violence.

At bottom, this case rests on witness credibility. Even if Roe had not recanted, USC was still faced with conflicting accounts of the incident: Boermeester disputed the characterization of the incident as violent, contending they were merely "horsing around." MB2, an eyewitness to the incident, admitted he lied in his initial statement. Given these conflicting statements, we cannot say the record contains such overwhelming evidence as to render harmless the errors identified in this case.

## DISPOSITION

The judgment is reversed and the matter remanded to the superior court with directions to grant Boermeester's petition for writ of administrative mandate. Should USC choose to proceed with a new disciplinary hearing, it should afford Boermeester the opportunity to directly or indirectly cross-examine witnesses at an in-person hearing. Each party to bear his or its own costs on appeal.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P. J.

I Concur:


STRATTON, J.

35

**Boermeester v. Carry et al.**
**B290675**

WILEY, J., Dissenting.

Unaccountably, in California's first appellate student discipline case about domestic violence, the aggressor emerges as the *victim*. But the university was right to discipline this man. Substantial evidence shows he committed domestic violence. All procedures were fair. Overturning this discipline is unwarranted.

I

Substantial evidence reveals a textbook case of domestic violence. I append the victim witness interview and invite readers to examine it. (See appendix, *post*, pp. 24–37.)

A

I summarize the victim's interview.

After midnight, a drunken man called the woman he lived with. It was in the early hours of Saturday, January 21, 2017. He wanted her to come get him at a party and drive him home. She obeyed.

He was the drunkest she had seen him. She brought her dog Ziggy along in a cage in the car. The man was mean to Ziggy, and the dog was shaking. The man yelled at the dog, which cowered in the cage.

They got home and went to the alley. He wanted her to drop Ziggy's leash but she did not want to. The man wanted to see Ziggy running off the leash. The woman did not want Ziggy off the leash.

1

The man grabbed the back of the woman's hair hard and said "drop the fucking leash."  She said no.  The man grabbed the woman harder.  It hurt, so she dropped the leash.

The man grabbed the woman by the front of her neck.  He had done this before.  He did it to "freeze her" when he wanted to stop her.  When he did this, it sometimes scared her.

When he grabbed her by the throat this time, it was harder.  His grip was tight.  She could breathe but it hurt and she coughed.

He let go and laughed.

The man chose this moment to comment about *Westworld*.  This sci-fi show is about a theme park where robots look like humans.  Humans pay to enter and do as they please to the robots.  The humans can be violent and abusive without consequences because the robots' programming forbids harm to humans.

The man told the woman about *Westworld*:  "you can hurt the robots because they aren't well."

The man took her by the neck and pushed her hard against the concrete wall.  Her head hit the wall.  He let go and then did it again.

A neighbor came into the alley.  The man told the neighbor they were just playing around.

B

The man and the woman were students at the University of Southern California.  The man is Matthew Boermeester.  The woman is Jane Roe.

USC has student conduct rules.  One USC rule prohibits intimate partner violence.  The rule says intimate partner

violence is also known as domestic violence and includes causing physical harm to another person.

USC's rule against violence does not contain a playing around defense.

Witnesses reported Boermeester's treatment of Roe to USC, which promptly launched an investigation. On Monday, January 23, 2017, accompanied by her adviser Nohelani Lawrence, Roe met with a USC investigator and spoke at length. Roe cried throughout this interview.

## C

California law is familiar with domestic violence. USC is too. USC is an established institution of higher education that has promulgated rules about domestic violence and has hired professionals to investigate these cases. These trained professionals work daily in this specialized world. Their firsthand experience supplements their training. It is reasonable and procedurally customary to ascribe expertise about domestic violence to USC and to its campus specialists.

Boermeester says we should assume USC is ignorant. But he gives neither reason nor legal authority for his self-serving and illogical suggestion.

## D

Domestic violence is violence between people living together in an intimate relationship. (*People v. Brown* (2004) 33 Cal.4th 892, 895, fn. 1 (*Brown*).) USC refers to this type of violence more generally as intimate partner violence.

Domestic violence is a serious social and legal problem in the United States, occurring in every economic, racial, and ethnic group. Compared to other crimes, domestic violence is vastly underreported. Until recent decades, it was largely hidden from

3

public examination.  A fundamental difference between domestic violence and other violence (like street violence) is domestic violence happens within ongoing relationships expected to be protective, supportive, and nurturing.  The ties between victim and abuser often are strong emotional bonds, and victims frequently feel a sense of loyalty to their abusers.  (*Brown, supra*, 33 Cal.4th at pp. 898–899.)  Often abusers use psychological, emotional, or verbal abuse to control their victims.  (*Id.* at p. 907.)

Victims who report abuse to authorities may later protect the abuser by recanting their own reports.  This presents an exceptional challenge for authorities.  (*Brown, supra*, 33 Cal.4th at p. 899.)

In the *Brown* case, an expert explained domestic violence victims, after describing the violence to police, often later repudiate their descriptions.  There is typically "anywhere between 24 and 48 hours where victims will be truthful about what occurred because they're still angry, they're still scared."  But after they have had time to think about it, they commonly change their minds.  About 80 to 85 percent of victims recant at some point in the process.  Some victims will say they lied to authorities; almost all will attempt to minimize their experience.  (*Brown, supra*, 33 Cal.4th at p. 897; see also *id.* at p. 903 [quoting another expert who testified that, about 80 percent of the time, a woman who has been assaulted by a boyfriend, husband, or lover will recant, change, or minimize her story].)

Recanting is common because it is logical.  The victim may still care for the abuser and may be hoping he will not do it again.  (*Brown, supra*, 33 Cal.4th at p. 897.)  The abuser or the abuser's family may be pressuring or threatening the victim.  (*Ibid.*)

4

Professionals familiar with domestic violence understand victims logically may recant to protect themselves because recanting can appease the abuser.

The *Brown* opinion held expert testimony about recanting was admissible for the purpose of disabusing jurors of common misconceptions about how victims behave. (*Brown, supra*, 33 Cal.4th at pp. 905–908.) Part of the court's logic was, "when the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor." (*Id.* at p. 906.) In many or even most cases, however, that assumption would be incorrect.

USC presumably knows all this. There is no basis for presuming it is ignorant.

E

Substantial evidence permitted the USC investigator to understand Roe's account as a classic case of domestic violence. Roe's lengthy interview record, which appears at the end of this dissent, is substantial evidence.

Roe's account revealed Boermeester stayed at her apartment for a semester. Boermeester controlled her. He told her when she could speak and when she was too close to him. He used physical abuse when she did not obey. He poked and hit her, causing bruising. He told her to shut up. He kicked her when she got too close. He took her by the neck to "freeze her" when he wanted to stop her.

Boermeester made Roe feel worthless. He told her she was stupid and a lousy tennis player. (Roe was a nationally ranked member of the USC tennis team.) He was rude to her parents

and her friends, thus undermining her emotional support system and imposing a me-or-them choice.

Boermeester punished Roe if she misbehaved and made her feel as though problems were her fault, not his. He refused to return her apartment key, despite paying no rent and having no right to be there. He never apologized or took responsibility. When she asked if he would feel bad or sorry if he hurt her, he said no, because she brought it on herself.

In this domestic relationship, Boermeester grabbed Roe by the neck on January 21, 2017. He pushed her hard against a concrete wall, she hit her head, he let go, and then he did it again. He did not stop until a neighbor appeared, and then Boermeester said they were just playing around.

On January 23, 2017, Roe asked USC for an Avoidance Of Contact order against Boermeester. She requested emergency housing. The implication is unmistakable: she was scared of Boermeester and wanted to get away from him.

F

The domestic violence victim recanted. On Tuesday, January 24, 2017, Roe began recanting, and she continued in the following days. On February 7, 2017, Roe tweeted to the media that the charges against Boermeester were false. Roe became increasingly extensive in her recantation, through to the end of USC's investigation.

II

USC's investigation was thorough and fair.

The investigator interviewed 18 witnesses and wrote a 78-page single-spaced report. The report included lengthy statements from Boermeester and from Roe that vigorously asserted his innocence.

6

The amount of process was considerable. Accompanied by his mother, who is an attorney, Boermeester gave his side of the story during the investigation. Boermeester retained a law firm. On March 10 and 22, 2017—twice—he had the opportunity to review all information and documents the investigator gathered. Boermeester and his retained attorney reviewed this evidentiary record. Boermeester then had the opportunity to submit questions for Roe, but (through his attorney) he declined to do so. After reviewing the evidence, Boermeester had the opportunity to respond to the evidence, to answer questions posed by Roe, and to submit new information. Neither Boermeester nor Roe submitted questions for each other or for anyone else. Both opted to skip their hearings and to submit written statements in lieu of meeting.

USC's process involved four layers of review.

First was the investigation. Upon concluding the extensive investigation, the investigator determined Boermeester was responsible for intimate partner violence.

The second layer was a separate panel. The sanctions panel reviewed the record and decided to expel Boermeester.

The third layer was the Misconduct Appellate Panel. Boermeester appealed to this separate panel. Pages 494 and 495 of the Administrative Record spell out the duties of this Misconduct Appellate Panel. These rules empowered the Misconduct Appellate Panel to decide whether substantial evidence supported the investigator's fact finding. The Misconduct Appellate Panel also was to determine whether this fact finding supported the investigator's conclusions about policy violations.

7

This Misconduct Appellate Panel exercised independent judgment. It recommended a two-year suspension rather than expulsion for Boermeester.

The fourth layer was USC's Vice President for Student Affairs, who was USC's final decisionmaker on student discipline. This USC Vice President overruled the Misconduct Appellate Panel's recommendation and determined the appropriate sanction was expulsion.

Boermeester applied for a fifth layer of review by filing in the Superior Court. On March 21, 2018, the trial judge rendered a comprehensive and thoughtful 22-page opinion rejecting Boermeester's claims.

The trial court found substantial evidence supported USC's decision to discipline Boermeester.

The trial court emphasized the contemporaneous nature of Roe's initial statement on January 23, 2017, noting the law ascribes more reliability to statements made right after a stressful event than to statements made only after witnesses have had time to ponder the consequences of their words.

The judge quoted from the *Brown* case, reciting the established tendency of domestic violence victims to recant as part of the behavior patterns common in abusive relations. The judge wrote the "tendency is so well established that it is admissible, in the form of expert testimony, in prosecutions of domestic violence cases."

The judge canvassed California law and rejected Boermeester's claim that USC had denied him due process. The court found USC accorded Boermeester ample process.

In sum, Boermeester got full notice of the charges and the evidence against him. He had multiple opportunities to respond.

8

The process took more than a year and generated a record exceeding 2,000 pages.

The process's conclusion was Boermeester took Roe by the throat and shoved her against a concrete wall, which was intimate partner violence. USC deliberated about the penalty and decided to expel Boermeester.

USC's process was careful and fair. Its conclusion was straightforward: Boermeester should be disciplined for his domestic violence.

### III

Boermeester's least specious argument about his supposedly unfair treatment concerns live witness cross-examination. (I agree Boermeester's notice was ample and his suspension was proper.) But Boermeester *refused* to submit cross-examination questions for Roe. No wonder. His tactical reason was that questioning Roe was the *last* thing Boermeester wanted, now that she had recanted completely and had come over to his side in a public way, on Twitter and all the rest. Questioning Roe—chancing any opportunity for her to modify or to contradict her recantation—offered Boermeester only peril. From Boermeester's perspective, Roe's recantation was perfect as it stood. Additional questioning could only spoil a good thing. So naturally Boermeester's lawyer refused to submit questions for Roe.

That means the cross-examination issue on appeal is entirely manufactured. It is not unfair to deny someone something they did not want.

Lest there be doubt, study the exact words in the record. USC asked Boermeester's attorney to submit questions for Roe and, through counsel, Boermeester refused. In response to USC's

invitation to propose questions for Roe, Boermeester's lawyer told USC "*I am not interested in having* [*Roe*] *come in and being put on the spot yet again.*"  The italics are mine.

Boermeester and his lawyer were free to ask for anything they wanted because the USC investigator created a continuously productive and collegial working relationship during the investigation.  When Boermeester's lawyer peppered USC with e-mail questions, USC responded promptly and professionally.

For example, Boermeester's lawyer e-mailed USC that he could not access a document from his desktop computer.  USC wrote back within five minutes:  "I just checked and you were granted access.  I went ahead and re-invited you.  Let me know if it works."

Sometimes USC did not grant Boermeester and his lawyer everything they wanted.  But other times USC did accommodate Boermeester and his lawyer.  USC's written rules did not mandate or require these accommodations.  USC gave them anyway, because it was behaving fairly and reasonably.

For instance, USC offered Boermeester and his lawyer a second time to examine the evidentiary record—an invitation Boermeester and his lawyer accepted.  No USC rule required this.

In another situation, Boermeester's lawyer asked USC to give Boermeester access to a telephone while examining evidence because the lawyer had "run into a serious snag here."  USC granted his request:  "No problem."

It was 4:59 p.m. when Boermeester's lawyer e-mailed this request for a favor.  It was 8:09 p.m. that same day when USC granted the favor Boermeester's lawyer requested.

USC literally was working overtime to be responsive to Boermeester and his lawyer.

Through all this free give and take, Boermeester's lawyer *never requested live cross-examination*. Rather, he expressly disavowed it and instead asked that USC e-mail questions to Roe. USC agreed to do that. USC's response was: "You send me the questions and we will ask them of [Jane Roe]."

Boermeester's lawyer wrote "We would want to have questions sent to [Jane Roe] to respond and answers sent to us unfiltered."

USC said it indeed would not filter. It would provide the answers verbatim, and he would get them before any Summary Administrative Review.

The sole difference between Boermeester's lawyer and USC during this e-mail exchange was whether Boermeester would or would not get Roe's answers that same afternoon—an immaterial timing detail Boermeester never mentions in briefing to this court.

Boermeester claims this one exchange about filtering shows he adequately preserved for appeal all issues regarding cross-examination. This is incorrect. USC told Boermeester it would give him Roe's unfiltered answers. True, there was an issue about timing, but Boermeester has abandoned this timing issue. He has never raised it in this appeal. His issue now is cross-examination. But Boermeester wrote USC "I am not interested in having [Roe] come in and being put on the spot yet again."

Grasp the strangeness of this situation. To USC in 2017, Boermeester's lawyer said he did *not* want Roe to come in and be put on the spot again. On appeal in 2020, Boermeester's lawyer

11

now says it is reversible error *because* Roe did not come in and was not put on the spot again.

To rule for Boermeester on this issue in this situation is unusual.  Accepting such an argument in this context is unprecedented.

The same goes for witnesses besides Roe.  Boermeester never sought those cross-examinations, and for good reason.  These witnesses offered Boermeester nothing but danger.

Recall the context.  The looming problem was Roe's detailed and damning original statement, the one appended to this opinion.  An objective reading of that statement reveals it as the most powerful evidence in the case.

Boermeester admitted the basic physical facts.  He told USC "[m]y hand was on her neck, but it was normal."  When asked whether Roe made contact with the alley wall, Boermeester responded, "I mean, we were standing next to it.  It was a sexual thing."

Given that Boermeester's defense was his actions were mere horseplay—horseplay that Roe understood and accepted—there was no point in cross-examining witnesses besides Roe.

Cross-examining DH could not matter.  DH saw Roe pinned against the wall by Boermeester, who had his hand on her.  DH did not see or hear Roe hit the wall.  DH's account was consistent with Boermeester's version of events.

Cross-examining TS could not matter.  TS did not report seeing Boermeester put hands on Roe.  TS arrived in the alley after the event.  He was not an eyewitness to the disputed event.

Cross-examining MB2 was like cross-examining Roe:  a good thing for Boermeester to *avoid*.  MB2 initially minimized having seen much in the alley.  Then his guilty conscience made

MB2 contact USC on his own initiative.  MB2 had initially minimized because Roe asked him to protect Boermeester and to downplay the event.  But MB2 confessed his initial lie was bothering him.  What he had actually seen, he now revealed, was that Boermeester "domestically was abusing [Roe]."  He said the "truth is I really wanted to beat the shit out of this guy [Boermeester]."

Cross-examining a witness like that is playing with fire.  Boermeester sensibly passed on this opportunity to play Russian roulette.  Boermeester's reasonable litigation strategy was to disparage MB2's second statement as a contradiction and to avoid giving MB2 a soapbox on which to vent.

In sum, there is good reason why Boermeester never asked to cross-examine witnesses other than Roe.  These witnesses either did not matter or were hazardous to question further.  Boermeester sensibly avoided further questions to these witnesses.

There was no deprivation of a right to confrontation.  Rather, there was no request for it.  This was a thoughtful litigation strategy by competent counsel to avoid confrontation and to leave the record as it stood.  As it stood, the record was not pretty, but defense counsel had to play the hand his client dealt him.  Adding questioning—adding confrontation—was not going to help.  It was likely to backfire.  The choice was to argue the case as it stood or to risk making the record worse.  Counsel chose to steer clear of the risk.  That was reasonable.  But that also should have shut off any appeal on the topic.

Boermeester claims futility.  He says it would have been futile to ask for what he now says was indispensable.  That is incorrect.  His attorney was vigilant and aggressive.  When he

13

wanted something, he asked for it. Sometimes USC accommodated him; sometimes not. Every institution is free to depart from written procedures when both sides agree that is the fair and reasonable thing to do. Nothing barred Boermeester from asking for further questions for any witness.

Boermeester did not ask for questions, not because it was futile to do so, but because he did not want further questions. As we have seen, the record contradicts his claim it was futile for him to request questioning.

Boermeester cites *In re Antonio C.* (2000) 83 Cal.App.4th 1029, 1033, but there the prosecution conceded futility. That also is true of *People v. Hopkins* (1992) 10 Cal.App.4th 1699, 1702, where there is no sign the parties contested the issue of futility and consequently no analysis of the issue. These cases are irrelevant.

To show it is futile to object, counsel generally must show it is costly to assert your rights. (E.g., *People v. Hill* (1998) 17 Cal.4th 800, 820.) There was nothing like that in the civil and productive working relationship between Boermeester and USC. To reverse USC for failing to grant Boermeester something he never requested is unwarranted. It would be unprecedented, and an unwise retreat from the usual rule.

The usual rule is you must ask for something you later claim on appeal was vital, so the school can know what you want and can resolve your issue short of litigation. (*Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1018 (*Occidental I*) [issue must be raised in the first instance at the hearing or appellant forfeits it]; *Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 225 (*Occidental II*) ["By failing to make the argument until his

14

appeal to this court, [the complaining student] forfeited it."] [collecting forfeiture authorities].)

The rationale for this rule is fairness and efficiency. A school is entitled to learn the contentions of interested parties before litigation is instituted so it can gain the opportunity to act and to render litigation unnecessary. (See *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535.)

Boermeester asks to be excused from this rule of fairness and efficiency, so on appeal he can get what he never requested during the school's proceedings.

I would stick with the usual rule: if you want something, ask for it. Stockpiling secret grievances should not be acceptable.

Boermeester also makes a different argument than futility. This argument is unforseeability. Boermeester now claims he could not reasonably have been expected to foresee the holding in *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (*Allee*) requiring cross-examination. Boermeester makes this unforseeability argument as another excuse for attacking USC about the cross-examinations he never asked USC to give him.

Boermeester's unforseeability argument is insupportable. In *2016*, before the events in Boermeester's case, a court already had held "cross-examination was essential to due process" in a student discipline case. (*Doe v. University of Cincinnati* (S.D.Ohio 2016) 223 F.Supp.3d 704, 711.) This ruling was affirmed on appeal. Represented by the same lawyer now representing Boermeester, student Doe in the *Allee* case relied heavily on this *University of Cincinnati* precedent. The *Allee* court followed this lawyer's lead, repeatedly citing and discussing both the trial and appellate rulings in the *University of*

15

*Cincinnati* case.  (*Allee, supra,* 30 Cal.App.5th at pp. 1059, 1061, 1062, 1064, 1066, 1068.)

In short, Boermeester's lawyer in *2017* indeed could have foreseen something written into law in *2016*.

So the strangeness remains.  Boermeester's lawyer was comfortable asking USC for favors because USC was responsive and professional.  Boermeester's lawyer had legal authority for demanding cross-examination.  Yet this lawyer never requested cross-examination.  It was the opposite:  Boermeester's lawyer wrote *he did not want it*.  But now Boermeester's lawyer says USC treated him unfairly for not giving him what he did not want.  That is strange.

IV

Boermeester seeks to import precedents into this domestic violence setting from outside it, but his suggestion is unsound.  These precedents involve cross-examination when a woman and a man tell conflicting stories:  he said nothing bad happened; she said oh yes it did.  In those cases, disciplinarians had to decide which speaker to believe.  The accused man wanted cross-examination to shake the woman's story.  Here, by contrast, the two versions came from one witness:  Roe's witness statement close to the event versus Roe's later recantations.  Boermeester did not want to cross-examine Roe because that tactic could only harm him.

Boermeester cites precedents, but they never deal with a victim of domestic violence who recants.  His citations do not apply here, because the worth of cross-examination to an accused changes fundamentally when the victim recants.  An accused wants to confront accusers steadfast in their accusations to shake the force of their accusations.  But when a domestic violence

16

victim has publicly recanted, the accused already has all he wants. Further questioning offers him only hazard.

Boermeester's precedents follow a common fact pattern inapplicable to this case. The common fact pattern involves two people who do not live together: they are not cohabitants. They are not in a *domestic* relationship. And there is no domestic *violence*. Rather, there is some short-lived and unhappy sexual encounter, with the woman and the man maintaining different versions afterwards about what happened. There is never recantation. Thus there is never the situation where the accused wants to sustain, not to shake, the recantation.

There are 11 such cases.

1. *Occidental II*, *supra*, 40 Cal.App.5th at pages 211–220 [woman and man lived separately and disagreed about whether she was too incapacitated to consent to sexual relations after a fraternity party; no mention of domestic violence or a recanting witness];

2. *Occidental I*, *supra*, 37 Cal.App.5th at pages 1006–1013 [woman and man lived separately; sexual penetration after a party; man said woman consented; woman said she did not consent; no mention of domestic violence or a recanting witness];

3. *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 627–629 (*Westmont*) [woman and man lived separately and disagreed about whether they had intercourse during a college party; no mention of domestic violence or a recanting witness];

4. *Allee*, *supra*, 30 Cal.App.5th at pages 1043–1053 [woman and man lived separately; one episode of intercourse; man said woman consented; woman said

17

she did not consent; no mention of domestic violence or a recanting witness];

5. *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1216–1229 (*USC 2018*) [woman and man lived separately and disagreed about whether the woman was too drunk to consent to a night of sexual activity; no mention of domestic violence or a recanting witness];

6. *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 46–55 [woman and man lived separately and disagreed about whether they had sexual relations during a birthday party; no mention of domestic violence or a recanting witness];

7. *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1058–1064 [woman and man lived separately and disagreed about whether the woman consented to intercourse; no mention of domestic violence or a recanting witness];

8. *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1058–1072 [woman and man lived separately and disagreed about whether they had consensual sexual relations; no mention of domestic violence or a recanting witness];

9. *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 224–238 [woman and man lived separately and disagreed about whether the man failed to protect the woman from sexual assault by other men at a fraternity party; no mention of domestic violence or a recanting witness];

10. *Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 578–580 (*Baum*) [woman and man lived separately and disagreed about whether she was too incapacitated to consent to sexual relations at a fraternity party; no mention of domestic violence or a recanting witness];

11. *Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 396–399 [woman and man lived separately and disagreed about whether their one episode of sexual relations was consensual; no mention of domestic violence or a recanting witness].

In sum, Boermeester asks this court to do what no court has done: overturn student discipline because the accused student did not get a chance to question a recanter, which is something the accused said he did not want and something that could have done him no good.

The same is true for Boermeester's new theory that the real problem was his inability to cross-examine secondary witnesses like MB2 and DH. If Boermeester has cited holdings to that effect, I have missed them. I am not familiar with a holding that discipline will be overturned when a school does not entertain cross-examination that is never requested.

The cases to date all concern the right of confrontation when it could possibly have done the man some good. No precedent deals with a situation where the man wanted to *avoid* confrontation because it offered him only peril.

V

It mystifies me how California Courts of Appeal have concluded the federal due process clause applies when there is no state action. Intermediate appellate courts have announced a state common law rule that procedures in private schools should

19

mirror the federal constitution. That is a leap. State law governing private schools can depart from constitutional rules that govern state institutions. (E.g., *Doe v. Trustees of Boston College* (1st Cir. 2019) 942 F.3d 527, 533–534.)

Someday the California Supreme Court may choose to trace and to evaluate this rule's rise in the lower California courts.

If this happens, it may be notable that the present is a time of ferment in the field of student misconduct discipline.

## A

The law is in ferment.

Boermeester contends it is unconstitutional for schools to use a disciplinary process departing from a fully adversarial model. USC designed a less adversarial model we can call an investigatory, as opposed to an adversarial, approach.

It may be some esteemed institutions of higher education prefer an investigatory approach to an adversarial one. (See Tamara Rice Lave, *A Critical Look at How Top Colleges and Universities Are Adjudicating Sexual Assault* (2017) 71 U.Miami L.Rev. 377, 393–394.)

Perhaps there are good reasons why.

Some courts condemn the investigatory approach. (See *Baum, supra,* 903 F.3d at pp. 581–585; *Allee, supra,* 30 Cal.App.5th at pp. 1067–1069 [citing *Baum*].)

But this position is controversial. (See *Haidak v. University of Massachusetts-Amherst* (1st Cir. 2019) 933 F.3d 56, 68–71 [criticizing *Baum*; U.S. law considers the inquisitorial or investigatory model "fair enough for critical administrative decisions like whether to award or terminate disability benefits. See *Sims v. Apfel* [(2000)] 530 U.S. 103, 110–[1]11 . . . (explaining that Social Security proceedings are inquisitorial rather than

20

adversarial).”]; *Westmont, supra*, 34 Cal.App.5th at p. 637 [combining investigative and adjudicative functions does not, without more, deprive a student accused of sexual misconduct of a fair hearing]; *USC 2018*, *supra*, 29 Cal.App.5th at p. 1235, fn. 29 [although investigator held dual roles as the investigator and adjudicator, the combination of investigative and adjudicative functions does not, without more, constitute a due process violation].)

In sum, there is a nationwide legal debate about the right way to investigate claims of student misconduct. There is little consensus.

B

The facts are in ferment. At this moment there is considerable procedural experimentation. On hundreds or thousands of campuses across the land, informed and thoughtful people are discussing the right way to handle these cases. This discussion is in good faith and is wide open. There is ongoing innovation and little consensus.

The American Law Institute (ALI) launched a project in 2015 to evaluate this debate and to advise school decisionmakers. By design, the ALI's process is deliberate and thoughtful. The project remains in process.

C

At this moment of discussion, a grave concern is the effect of mandatory cross-examination on the willingness of victims to report abuse.

We are learning a lot recently about why abuse victims may be reluctant to report abuse and to trigger a process leading to more abuse.

21

Being cross-examined is an unattractive prospect.  Skilled cross-examiners take pride in being fearsome.  We often say a good cross-examination "destroyed" a witness, that the cross-examination was "scathing."  These words are accurate.  They are telling.

The prospect of being destroyed by a scathing cross-examination can deter reporting.  Fine words in opinions somewhere about all the possible procedural adjustments may mean little to a lonely and traumatized woman anguishing over her options.

Striking the right balance is a challenge.  It would be beneficial to tap the ongoing national debate and experimentation before promulgating some mandatory constitutional code of campus procedures.  Judge Henry Friendly praised the wisdom of Justice Harlan and quoted his words:  "I seriously doubt the wisdom of these 'guideline' decisions.  They suffer the danger of pitfalls that usually go with judging in a vacuum.  However carefully written, they are apt in their application to carry unintended consequences which once accomplished are not always easy to repair."  (Henry Friendly, *Some Kind of Hearing* (1975) 123 U.Penn. L.Rev. 1267, 1302, quoting *Sanders v. United States* (1963) 373 U.S. 1, 32 (dis. opn. of Harlan, J.).)

D

Striking the right balance ought to concern courts, but not in this case.  This case was never about a denial of cross-examination—not until now, at any rate.  At the university level, Boermeester disavowed interest in "putting Roe on the spot again" because his litigation strategy was to sustain her recantation and to avoid roiling it.  Nor did Boermeester lift a

finger to try to cross-examine other witnesses during USC's process.

Boermeester's counsel has manufactured this cross-examination issue. He has done so because he hopes someone will accept his construct, not because cross-examination was anything he sought at the time. His construct makes Boermeester the victim. USC is the perpetrator.

This is awry. I would not intrude on USC's decisionmaking, which was procedurally proper and is supported by substantial evidence.

WILEY, J.

*Jane Roe Intake Interview*
*Source: Administrative Record pp. 183–189*
*Word count: 3404*
*Notes: "T9" presumably means Title IX*
*MB presumably means Matthew Boermeester*

Jane Roe Intake – (JR)
Date: January 23, 2017
Location: CUB
Advisor: Lani Lawrence
Interviewers: Lauren Elan Helsper (LEH) and Gretchen Means (GM)

JR has been dating Matt since March 2016. Their relationship was on and off for a while but that is when they started seriously seeing each other.

Why are you here today?
- JR knows this is a "bad situation" but she hasn't told anyone. "This is the worst one, the one people know" (regarding the incident over the weekend which prompted her coming to the office)
- "I still care about him"

At the beginning of the relationship JR had bruises on her arm from Matt and her dad found out and wanted her to get a

restraining order against him. JR told her father that the bruise was "circumstantial" and his concern died down. Her parents don't like him.

She doesn't know what to do or if she wants to do anything. She knows he can't be in her life

Matt lived with her all fall semester. He got "screwed out" of his rent situation in August and it fell through. He presented it to JR as, "I am here all the time, I am going to live with 'CT' and pay a little there" but stay with JR really. He told her about living with CT and paying money there so they weren't moving in together. He wasn't paying rent to JR or to CT. Matt moved his stuff into her apartment and he was living with her. He never presented it to her though as he was going to move in. He never left. They broke up and he would stay or they would fight and he wouldn't leave.

Now he has his own apartment since Christmas break but he has still been at her apartment.

Matt tells JR that he hates her and is mad at her and when she asks "Why are you here?" He said, "I can do whatever the fuck I want" and tells her to "Shut up."

"There is no arguing with him. He doesn't think he is doing anything wrong." Matt thinks JR deserves it. They broke up because JR went to dinner with her ex and lied about it to Matt and so he sees it as her fault. The other day, JR asked Matt, "What if you hurt me bad. Would you feel bad? If you were

playing around and it hurt?" Matt told her "no," because it would have been brought on by her. He gets mad at her if she doesn't back away or stop talking when he tells her too [*sic*].

JR acknowledges that she knows that this is not her fault.

Matt was not nice to her roommates so they didn't like him. One of her roommates tried to get her evicted because he was there. This was in end of October. The roommate went to the landlord instead of talking to JR. The roommate didn't realize that Matt doesn't listen to JR when she tells him to leave and instead tells her that she can leave but it is her house.

She is 5"4-5"'5 [*sic*] and she weighs 130. He is stronger than she is but she doesn't factor that into things.

On Friday they spent the day together. They are not together and haven't been together for a while but he still is at her house often. They had a "good day." MB went to party and was drinking a lot. He called her at 12:30–1am to pick him up so she did. (He often goes out, parties, and calls her to pick him up). They went to get food and came back to her place. He was the drunkest she has ever seen him. He was yelling at people and tried to be funny. There is an alley behind the house and he was yelling in the alley.

They got out of the car and he wanted her to drop Ziggy's leash but she didn't want to. (He is mean to Ziggy and she was shaking in the floor. He yells at her and she cowers in the cage). He grabbed the back of JR's hair hard and said "drop the fucking

leash" and she said no. Matt grabbed JR harder and then she dropped the leash because it "hurt." DH heard them yelling.

Matt grabbed JR by the neck (which he has done before but this time it was harder). She was coughing and he let go and laughed. He made a comment about the show "west world" and how you can hurt the robots because they aren't well. JR didn't really understand it). He grabbed her by the neck, pushed her hard against the [concrete] wall, she hit her head, he let go and then did it again. DH and TS saw and another neighbor came out. He said that they were just "playing around."

DH and TS took her into their apartment and Matt was asleep when she got back to her room.

(Regarding holding her by the neck) - Matt grabbed her from the front. He was holding "tight." She could still breathe but it hurt and she coughed. He has done this before. But he says that he is "messing around." He does it when he is rough housing (not sexually) or to "freeze me" when he wants to stop her. The times they were "messing around" she was sometimes scared.

He hits her or does something to egg her on and tries to get her to play and then he grabs her by the neck to stop her.

This Friday was the "worst." Her head hurt for a little after she hit the wall.

She often has bruises on her legs or arms because "he is always doing something."

If JR didn't stay with Matt after the incident, "he wouldn't understand." For example, the next day he slept all day in her bed. She went to speak to DH and Matt said don't go over there, "tell him to deal with his shit" and Matt was "freaking out" and said, "what the fuck? Why are you taking that long?" (when it was only 30 minutes)[.] Matt just yells at her. She didn't want to make it worse and so she just does what he says to avoid yelling and conflict.

Bruises on arms – When JR doesn't do what Matt wants she gets bruised. That is a more recent thing (when they were together, he would grab her arm too tight). Recently Matt is "more angry," "I am too close to him or I don't get away fast enough or if I don't stop talking" then he hits her with a pointed finger so she gets bruises. He does that to her arm, leg, lower back, stomach. Sometimes he laughs. She feels like she doesn't respond as "severely" as she should. She says ouch but doesn't laugh, but she "downplays it" and is not firm. She does this to keep it light and because she is uncomfortable. She tried yesterday to be more serious and he said, "stop, I don't care." He didn't take her seriously.

Matt has pulled her hair more than once. He gives her a dead arm/leg (punches in a certain spot so the body goes numb and it hurts but it goes limp). It is a hard hit. He does this when she doesn't do what he wants her to do.

He thinks it is fun to "fight" and wants her to engage and eggs her on or when she doesn't do what he wants. Even when she does engage. (He slaps her 15 times to egg her on and then

finally she does it back and says stop and he says stop and then he will do it again and say, he had to get her back). "It is to get her going." JR thinks he thinks it is having fun.

He did it yesterday when they were just watching TV and he started (she doesn't know what starts it) and he starts messing with her, hitting her and she says stop and he will keep going.

"It feels too painful for it to just be playful but the attitude behind it is just being playful." She is not sure if this is what he is used to from his brothers or is not realizing enough is enough.

When Matt first started hurting her, it was not often and it has gotten worse. "I was kind of taken aback." The first time she was scared of him was when they got into a fight at the beginning of the relationship. He was yelling, and "shook me really hard" and threatened to hit her. This was the first time she was scared. This was a while ago. She thought about it like just a fight. "He said that he is only like this because she made him do this, or he can't trust her or they weren't actually together and that "he will get better."

"It then started playful and it hurt but his attitude was confusing and it just got worse and worse and then I was like in it."

Before Matt, JR was with someone else that was a really good guy. They were together for about 2 years. Matt came into her life. He is very manipulative and she believed that she wanted to be with Matt instead. "[T]he highs are very high and the lows are very lows [*sic*]." At that point her relationship with the other

guy was "very solid."  "Matt was flashy" and took her on crazy dates that the other guy couldn't give her.  She drifted to Matt. He said that at first, he couldn't be nice to her because she was with the other guy and that made sense to her at the time.

They had problems in the relationship.  He was mean and always putting her down.  He told her how stupid she is.  Recently for a 24 hour period she decided to write down every mean thing he said to her on her phone.  She read a long list of things. After hearing how dumb she is, how bad she is at tennis, and always being put down, she started to believe it.

JR did not cheat on Matt but "when things got bad" (her ex was always sweet) [s]he sometimes would go to dinner with the other guy because "it was really bad" (with Matt).  She slept over her exes [*sic*] house but didn't do anything.  She knew it would sabotage the relationship with Matt.  The next day, she told Matt and he shook her, Matt was so "mad" and somehow convinced JR that she needed to fix it.  He made her feel bad and that she was imagining these problems.  "So he would give me one more chance."  "[B]ut already then I was on his leash."  The whole time she had to prove herself.

In the end of October, her ex said that he had to go back to Brazil and that he wanted to go to dinner with her first.  She went without telling Matt but he found out.  Matt broke up with her. He told her that she deserved it.  He told her that she could still prove her worth and "get me back."  He would go out nightly and come back to JR's place and yell at her nightly and she would cry and it was "very intense."

When they broke up (and in her prove herself phase) she hooked up with someone and he was nice to her. Matt found out and thought that, "I did so much wrong that I deserve this."

He still lived in her room and slept in the same bed as JR even though they were broken up. That is when her roommate tried to evict her.

They didn't talk for a week over New Years and then he was at his apartment for a week. He had surgery on his knee, he got sick and came back to JR's because he said, "closer to walk there." Matt told her that he came to stay with her because "You do what I say, I hate you but it is easier." "I need to take care of him he says."

His ego is "through the roof" since the Rose Bowl.

She spent a lot of time over the summer with his family. His dad is super sweet and submissive, his mom runs the family. Mom is a lawyer, she is very nice but in charge of the family.

JR gave a timeline of events:
December 2015–April 2016 Matt was in her life (seeing each other but not dating)
April 2016–end of October 2016 – they were dating
June 2016 (early) – shaking incident
1st August – he officially moved into her house
End of October 2016 – they broke up but he was still at her house. He was going on dates with girls and talking to girls while living with her

Matt moved out the first week of spring 2017

From April to June – there were no physical incidents
The shaking incident was in June because she went to dinner
with her ex
June to when Matt moved-in to her place in August – the
physical contact was not very often maybe once a week if not less.
"It was playful but it wasn't that bad.  It has gotten stronger.  It
didn't hurt like now."
Her parents noticed the bruising before the June incident – Matt
kicked her when she was in bed because she was coming closer to
him and her kicked her arm to get her away.  Her parents found
out because she was crying and told her ex that she was scared of
Matt and he called her parents and told them
Shaking incident – "he was mad because I didn't want to show
him my phone so he took it, threw it out the door" and then shook
her.

The physical contact "became more often and more hurtful" – "I
think it is longer than I really want to remember.  In my mind I
think it was really recently.  But then I had the bruise on [my]
arm in May."  It has been more often since they broke up if not
before then and probably something every day but the degree
varies if they spend solid hours together in privacy.
- He did these things privately.  She doesn't think anyone
  knew.
- Her roommates knew but her voice didn't get the urgency
  to make them think it was bad.  They knew he was verbally
  abusive.

The next day (after the weekend incident) she tried to talk to Matt and she said that he scared DH and TS and they heard him yelling and "it looked really bad when you pushed me and it looked really bad with your hand around my neck." Matt said "it was a joke, we were messing around, tell them to calm down." He said, "tell them you're into that" and he implied that it was foreplay.

Matt is the star child and is very spoiled but if his parents knew they would be very  mad.  Matt does not talk to her nicely

Mom – [name redacted] (lawyer)

He never forced her during sex or hurt her during sex.

On Saturday he was yelling which got DH and TS's attention, He was just being a loud drunk person.  DH at first thought it was a loud drunk person and then he heard JR's voice.  At first she was laughing, probably they heard her say no to drop the leash.  He woke them up and then they heard her.

He wanted to "toughen me up." He wanted me to call him names back or hit him back.  He thought [she] was too submissive because she didn't want to.

Looking back how do you think your roommates might describe you as they thought something was going on?
- Her best friend wanted her out of the relationship for a long time.  She was strong and told JR she was "weak."

- DH would say she has been very "preoccupied" she can't do what she wants.  She is very controlled.
- People didn't understand the severity but knew that he was treating her badly.  They thought she was being weak or stupid.  She was she knew because it is hard.
  - "He is very good at making me feel like I need him." He has torn her down so she has become dependent on him.
- Throughout the time, her ex was supportive and telling her she was the best and trying to lift her up but it wouldn't register because Matt was saying negative things to her
- She still had feelings for Matt and she didn't know why. She has been "holding onto the highs even though it has been low for a really long time."

A week before they broke up she went to him to break up because he was mean and disrespecting her parents and but [*sic*] he told her "no, we aren't breaking up."  He said "every time we get into a fight, you are going to run?  No, we are going to work this out."

He always said that he was the best thing that she was going to get.  She started to believe it and she couldn't go anywhere.

Now she is starting to realize how bad it was.  She became numb that he treats her bad and isn't worked up like she was in the past.  ([T]his is after the break).  She made him soup because he told her he was sick and she offered toast.  He was so mean about the toast that she cried.  But in the past week, she is stronger.

Last night, he said that he is done and that he won't come over anymore. But in the past, she would say, "no, don't go" but she "still can't say get the fuck out." She is less madly in love with him than she was before.

Her best friend is dating RP and he is a great guy. RP told her Matt is 'bad news.' RP asked MB for JR's key back over break and Matt said no.

GM explained her options regarding moving forward:
1. Avoidance of Contact – and we will try to get the key back from him
2. GM explained that we have to investigate what happened on Friday even without her because of the witnesses and the neighbor
    a. This afternoon there is a panel regarding an interim suspension
        i. Clay already knows

She is scared because she didn't want "to burn him." She knows that she didn't bring it to us. GM explained that people are very scared for her. GM said that it will be clear it was made by T9 and not her.

She graduates in December 2017 and he has one more year at USC.

DH told JR that he is not going to participate.

GM offered emergency housing.  She wants it to feel safe.  She wants it tonight and tomorrow night and then Sunday and Monday when she returns from her team tennis trip.

GM explained:

    1.  The panel will meet re: to discuss whether interim action is necessary to protect JR and restrict him

    2.  AOC will be served from T9 and Matt will not be allowed to contact apartment – mates (JR stated that she wants the AOC)

    3.  He will be served with the charge letter for IPV

    4.  He will be served with everything at once – on Thursday after she goes to Auburn

JR's dad is a professor and if he calls we can explain the process and [what] we are doing.

Matt has the password for her computer and she is going to change it.

She has a hard time relating to the severity for herself and for his consequences

Witness – Best friend is an alum (GO);
She is going to get us the name of the neighbor – MB2

{REDACTED}
Lani's number – GM has

JR is not participating in the investigation.  JR and LL completed the FERPA form and the confidentiality agreement

GM explained academic accommodations

Investigator Notes:  JR was crying throughout the meeting.  She offered information regarding her entire history with MB.  After GM told her that T9 was forced to go through an investigation on the Friday incident as there are witnesses, JR said that she understand[s].  JR does not want to participate in the investigation and did not want T9 to charge on the conduct that she divulged other than the Friday incident.